# IN THE COURT OF APPEALS OF IOWA

No. 18-0303
Filed July 3, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JOHN MATTHEW OSBORN,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Pottawattamie County, Susan K.

Christensen, Judge.

        John Osborn appeals from judgment and sentences imposed upon his

convictions for four counts of sexual abuse in the third degree.  **AFFIRMED.**

        Mark C. Smith, State Appellate Defender, (until withdrawal) and Vidhya K.

Reddy, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.

        Considered by Mullins, P.J., Danilson, S.J.,* and Vogel, S.J.*

        *Senior judges assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DANILSON, Senior Judge.**

John Osborn appeals from judgment and sentences imposed upon his convictions for four counts of sexual abuse in the third degree, in violation of Iowa Code sections 709.1 and 709.4(2)(c)(4) (2014). Osborn contends his trial counsel was ineffective in failing to object to a witness's testimony as beyond the scope of the minutes of testimony; the district court abused its discretion in admitting as an exhibit the criminal complaint and attached affidavit, which was offered to refute Osborn's inference investigators rushed to judgment; and the court imposed an illegal sentence (four concurrent terms of imprisonment), arguing multiple convictions on four counts of sexual abuse where the marshalling instructions are identical must be merged.

**I. Background Facts and Proceedings.**

On September 3, 2014, the State filed a trial information charging Osborn with four counts of sexual abuse in the third degree, class "C" felonies, in violation of Iowa Code section 709.4(2)(c)(4) (2013). The State alleged that, on or about July 16–17, 2014, Osborn perpetrated sexual abuse on M.V., a fourteen-year-old child.

A jury trial commenced on December 19, 2017.[1] In its opening statement, the defense asserted Osborn's daughter T. would testify that during a sleepover

---

[1] This appeal arises following a retrial. *See State v. Osborn*, No. 15-0899, 2016 WL 3273104, at *1 (Iowa Ct. App. June 15, 2016) (affirming the grant of new trial based on newly-discovered evidence). Osborn's wife, Michaela testified at the first trial and for a deposition. In her earlier testimony, Michaela stated that after going to bed at about 10:30 p.m. on July 16, she woke up at midnight to let her dog out and to get a drink of water. When Michaela woke up at midnight, Osborn was asleep in bed, and T. and M.V. were no longer in the living room. Michaela then went back to bed and woke up at 3:00 a.m. to again let the dog out and get another drink. Again, she saw Osborn was in bed with her,

with M.V. on July 16–17, between about 11:45 p.m. and 3:30 a.m., she and M.V. were in her bedroom and neither one of them left. The defense also asserted Michaela was expected to testify she got out of bed at midnight and 3:00 a.m. to get a drink of water and to let her dog out and on both occasions Osborn was in bed with her, and the girls were not in the living room.

At trial, the evidence demonstrated Osborn started communicating through instant messages and phone calls with M.V. in June 2014. The communications started as small talk about sports and T., but intensified and became sexual in nature. M.V.'s parents became aware of the communications and M.V. admitted there had been sexual conduct during the July 2014 sleepover.

Michaela testified she went to bed at about 10:30 p.m. and the next thing she remembered was getting up the following morning at around 9 a.m. She also testified,

> That when being intimate, if [Osborn] was I guess kissed on his ears or neck that he couldn't—wouldn't be able to stop. Also, that he would leave the room to check on [T.] during being intimate to make sure that she was still asleep if she had fallen asleep in the living room.

The defense moved for a mistrial, asserting the State had elicited false testimony. The State responded that while Michaela's testimony was different than on previous occasions, she had contacted the prosecution and stated she no longer wanted to testify for Osborn, and after considering the information from the previous trial, she was no longer certain she woke up during the night of the sleepover. The court denied the mistrial motion.

---

and the living room was empty. Michaela was "one-hundred percent" certain in her knowledge and memory that she awoke at those particular times.

On cross-examination, Michaela acknowledged she had twice before provided testimony she woke up at midnight and 3:00 a.m. and she saw Osborn in bed at those times and that she did not see the girls in the living room at midnight. The following exchange then occurred between the defense attorney and Michaela:

> Q. Showing you page 16 of your sworn testimony from January 27, 2015. Were you asked this question? I'm going to read it for you. "Okay. How about at midnight when you woke up, did you see anybody?" Did you provide this answer? And I'll read it for you. "No. Nobody was in living room, so I only saw John because he was in bed." Did I read that right? A. Yes.
>
> Q. Do you recall giving that testimony now? A. I do recall that testimony. However, you e-mailed me and asked me to reconsider my timeline. And upon reconsideration, I cannot recall for 100 percent if I was up that night or if it was only because I was getting up every night with my dog.

The cross-examination continued to explore Michaela's prior timeline testimony.

In another exchange, the defense asked:

> Q. Showing you page 255 of the transcript from the second occasion you gave sworn testimony. I just want to make sure I get this right, so hold me accountable if I don't read this right. Line 4, this is me asking the question. I say, "How sure are you that this was around midnight?" Answer, "I am a hundred percent positive. [The dog] Bella tends to go in cycles, and, once she develops a habit, she's like clockwork. It's like she has an internal alarm clock, and she gets up at the same time every night for weeks. And, actually, she had continued to get up at the same time through now. She's still doing it, getting up at those same times." Did I read that right? A. Yes.

Michaela acknowledged that since the prior testimony, she and Osborn divorced.

On redirect, Michaela testified she had considered her prior testimony after reviewing other's testimony, which raised concerns. She stated:

> There were things that were testified to by other people that were things that I knew my husband to do when he was being intimate. And I felt extremely uncomfortable with that because for

someone else to testify to that, I can only imagine they must have experienced it. How else would they know that he has specific habits.

Following additional questioning, the defense renewed its motion for mistrial, alleging prosecutorial misconduct. The defense argued the prosecution knew Michaela was going to change her prior testimony and because "[m]y defense is a timeline defense" Michaela's prior testimony was "crucial."

The prosecutor asserted Michaela had contacted her and stated she would rather testify for the State than the defense. The prosecutor noted: "I said, 'Okay, I can make that happen. I have you listed as a witness.'" The trial court found no prosecutorial misconduct or perjury had occurred, noted the witness's credibility was for the jury to determine, and denied the motion for mistrial.

M.V. testified that on July 16, she stayed overnight at Osborn's home as T.'s guest. During a sleepover, Osborn, Michaela, T., and M.V. all watched television. M.V. testified Osborn took M.V. aside under the pretense of showing her vacation photos, but "he would make [M.V.] lean across him to see them" so he could touch her breasts. At about 10:30 p.m., Michaela went to bed. M.V., Osborn, and T. started to watch *The Avengers* (a two-and-one-half-hour movie) and T. fell asleep during the movie. M.V. testified:

> Then [Osborn] started like touching my stomach and talking to me. And then he just said, "We should go make your bed in [T.]'s room." I closed the recliner loudly and it woke up [T.], and he kind of looked at me. He was mad. I told her that I was just going to the bathroom and went in and sat there for a few minutes. I came back out and got back into my seat. We kept watching the movie. Then [T.] fell asleep again. And [Osborn] said, "Let's go make your bed in [T.]'s room but quietly this time." Then we went into [T.]'s room. And I walked in first, and I turned on the light. He walked in behind me and turned it back off and shoved me up against the wall. He put his tongue in my mouth kissing me, my neck, touching my stomach.

M.V. testified, "He liked me to kiss his neck and lick his ear." M.V. testified further that Osborn "asked [M.V.] if he could do oral sex on [her]" and "told [her] to take off [her] pants and lay on the couch." Before he did anything else, Osborn "went and checked on [T.] to make sure she was still asleep." Then, Osborn came back in and "performed oral sex on [M.V.]" for "[a] few minutes maybe," before he went to "check on [T.] again." When he returned, Osborn asked M.V. to perform oral sex on him.

> He asked me to do that to him. So he pulled his penis out and had me get on my knees, put it in my mouth. I couldn't do it. I kept gagging because I had never done it. It was gross, and I didn't like it. He wanted to come in my mouth. I couldn't do it.

Osborn told M.V. that "it was okay" and they would "try again when [she] was old enough." Osborn went out to check on T. again. When he came back, he performed oral sex on M.V. again—but this time, Osborn also used his fingers to penetrate M.V.'s vagina. Then, Osborn made M.V. "take all [her] clothes off, and on, and made [her] spin so he could look at [her] entire naked body."

Detective Mike Roberts testified about the police investigation that occurred after M.V.'s parents reported Osborn had had sexual contact with M.V. He testified he interviewed M.V., Osborn, T., and Michaela. He stated another detective interviewed M.V.'s aunt. Detective Roberts testified Osborn acknowledged texting M.V. frequently and that when he was driving with T. and M.V., M.V. "would give him some looks and flash him while she was in the car. When I say, 'flash,' flash her breasts." Osborn told the detective M.V.'s actions in the last several weeks made him uncomfortable. Osborn told the detective M.V. had once put her hands down his pants but he pushed here away. When asked about the night of June

17-18, Osborn told the detective "[M.V.] made advances towards me. . . . She flashed her breasts at me and google-eyed me." Detective Roberts also testified he obtained call logs from M.V.'s cellphone and computer software to recover deleted text messages on T.'s electronics and M.V. and Osborn's cellphones.

On cross-examination, the defense questioned the detective about the thoroughness of the investigation and the brevity of his interview with Osborn's daughter on July 31. The defense asked if the detective had already made up his mind concerning the investigation by July 24.

On redirect, the detective stated the investigation corroborated what M.V. had told him and acknowledged he had "author[ed] a five-page complaint as to all the reasons why you believed that this crime had been committed." The following exchange then occurred.

> Q. In that complaint do you go through and list like line by line all the reasons why you believe this crime has been committed? A. Yes.
> Q. And do you go through both statements that you received from Mr. Osborn and [M.V.] and explain why you think these allegations are true? A. Yes.
> Q. This Complaint doesn't even include all the other additional information that you received; is that true?
> [Defense attorney] MR. GLASER: Object. It's leading.
> THE COURT: Overruled.
> A. Yes. There's quite a bit more with transcript, data information from cell phones, etcetera.
> [Prosecutor] MS. SUDMANN: I would offer the complaint as an exhibit, but I'm not sure what exhibit I'm on, Your Honor.
> THE COURT: You are on 131.
> MS. SUDMANN: I would offer Exhibit 131.
> THE COURT: How would you like to describe it?
> MS. SUDMANN: Complaint.
> MR. GLASER: Object to relevance. I believe it's cumulative.
> THE COURT: Let me see it, please. Counsel, approach.
> (Sidebar.)
> THE COURT: Is this the exhibit we were talking about he earlier, 131, the one you're going to redact? This is just the police

report. You were talking about a statement, okay, because we don't have that on the record. Mr. Glaser, you were speaking earlier about redacting needing to be made on statements of the defendant's?

MR. GLASER: Yes.

THE COURT: It doesn't have any statements attached.

MS. SUDMANN: This is a response to this cross.

THE COURT: I understand, but I wanted to make sure if it included any actual statements.

MR. GLASER: Redact that after we're done today.

THE COURT: Ms. Sudmann, are you sure there's nothing in here that needs to be redacted? Or look at it before you download it.

MS. SUDMANN: I will look at it.

THE COURT: Okay. Just makes me nervous, okay.

(End of sidebar.)

THE COURT: Your objection to Exhibit 131 is overruled. Exhibit 131 is admitted into evidence.

Osborn testified and acknowledged inappropriately calling and texting M.V. However, he denied any sexual contact had occurred. He testified that after M.V. made a sexual advance toward him on the night of the sleepover he left the living room and went to sleep in the bedroom he shared with his wife.

Osborn's daughter also denied Osborn had the opportunity to sexually abuse M.V. because T. remained awake in the living room with M.V. until after her father had gone to bed, and then she and M.V. went to her bedroom where T. spent time on her electronics and texting.

Without objection by the defense, the jury was instructed identically on all four counts:

In Count [I, II, III, or IV] Defendant is charged with Sexual Abuse in the Third Degree. The State must prove all of the following elements of Sexual Abuse in the Third Degree:
1. On or about July 16, 2014 through July 17, 2014, the Defendant performed a sex act with Mackenzie Vrana.
2. The defendant performed the sex act while [M.V.] was 14 years old and the Defendant was 4 or more years older than [M.V.]
3. The Defendant and [M.V.] were not then living together as husband and wife.

If the State has proved all of the elements, the Defendant is guilty of Sexual Abuse in the Third Degree. If the State has failed to prove any one of the elements, the Defendant is not guilty of Sexual Abuse in the Third Degree in Count [I, II, III, or IV].

In closing argument, the prosecution asked the jury to consider whether Osborn was guilty of four sexual acts: "Did [Osborn] put his mouth on the victim's vagina? Did [Osborn]'s hand touch the victim's vagina? Did the victim's mouth touch [Osborn]'s penis? Did the victim's hand touch [Osborn]'s penis? Those are the four sex acts at issue before you."

The jury found Osborn guilty on each count and the district court sentenced Osborn to an indeterminate ten-year term of incarceration on each count, with the terms to be served concurrently.

Osborn appeals, contending trial counsel was ineffective in failing to object to Michaela's testimony on grounds it was beyond the scope of the minutes of testimony and in failing to object to the admission of the criminal complaint and attached affidavit on hearsay grounds. Osborn also contends the district court abused its discretion in admitting the criminal complaint because it was irrelevant and cumulative. Finally, Osborn maintains the court imposed an illegal sentence.

**II. Scope and Standard of Review.**

"The United States Constitution and the Iowa Constitution both entitle criminal defendants to effective assistance of counsel. U.S. Const. amend. VI; Iowa Const. art. I, § 10." *State v. Coleman*, 907 N.W.2d 124, 141 (Iowa 2018). Because an ineffective-assistance claims are constitutional in nature, our review is de novo. *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016).

"We review evidentiary rulings for abuse of discretion." *State v. Huston*, 825 N.W.2d 531, 536 (Iowa 2013). "We reverse a ruling that the district court makes in the balancing process under rule [5.403] only if the district court has abused its discretion." *Id.* (citing *McClure v. Walgreen Co.*, 613 N.W.2d 225, 235 (Iowa 2000)).

"A district court's failure to merge convictions as required by statute results in an illegal sentence." *State v. Love*, 858 N.W.2d 721, 723 (Iowa 2015). We review of an illegal sentence for lack of merger for correction of errors at law." *State v. West*, 924 N.W.2d 502, 504 (Iowa 2019)*.*

**III. Discussion.**

*A. Ineffective assistance of counsel.* Osborn acknowledges his complaints of Michaela's testimony going beyond the scope of the minutes of testimony and an exhibit admitted into evidence should have been objected to on hearsay grounds must be analyzed under the rubric of ineffective assistance of counsel. *See Coleman*, 907 N.W.2d at 138. We agree. "Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Schlitter*, 881 N.W.2d at 388. Generally, we preserve ineffectiveness claims for possible postconviction relief proceedings to allow the record to be developed. *See State v. Gomez Garcia*, 904 N.W.2d 172, 186 (Iowa 2017).

The record here is inadequate to resolve Osborn's ineffective-assistance-of-counsel claims as defense counsel should have the opportunity to refute the claims. *See State v. Coleman*, 907 N.W.2d 124, 142 (Iowa 2018) (noting ineffectiveness claims should generally "be reserved for postconviction relief,

where counsel can have his or her day in court to respond to the defendant's charges"). Therefore, we "must preserve it for a postconviction-relief proceeding, regardless of the court's view of the potential viability of the claim." *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

**B. Admission of charging document.** Osborn contends the court abused its discretion in admitting the charging document, i.e., the criminal complaint, over his objections that it was not relevant and was cumulative. Osborn argues admitting the complaint as an exhibit was not a proper method to rebut the contention the State rushed to judgment in concluding Osborn had committed the offenses. We agree there may have been other more effective methods to rebut the contention but we find no abuse of discretion in the district court overruling Osborn's objections. The exhibit was clearly introduced to rebut Osborn's claim of a rush to judgment by reciting all the investigative facts supporting the complaint. Thus, the court's reasons were neither clearly untenable nor clearly unreasonable. *See State v. Putman*, 848 N.W.2d 1, 8 (Iowa 2014) ("A court abuses its discretion when its 'discretion was exercised on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" (citations omitted)). And, although prejudicial to Osborn, the exhibit was not more prejudicial than probative. *See* Iowa R. Evid. 5.403.

**C. Illegal sentence.** Osborn asserts the four sentences imposed upon the guilty verdicts merge and, thus, his concurrent terms of imprisonment constitute an illegal sentence. "An illegal sentence is a sentence that is not permitted by statute. If the legislature criminalizes two separate and distinct acts, separate sentences on each act are not illegal." *State v. Copenhaver*, 844 N.W.2d 442, 447

(Iowa 2014) (citations omitted); *see also*, *State v. Velez*, 829 N.W.2d 572, 584 (Iowa 2013) ("It is well established in Iowa law that a single course of conduct can give rise to multiple charges and convictions.").

Osborn concedes there is substantial evidence from which a jury could find M.V. testified to "at least four sex acts, each of which could support a separate count." With respect to his claim of an illegal sentence, citing *Love*, 858 N.W.2d at 724, Osborn asserts his "position is that the offenses were not marshalled in such a way as to require the jury to find a separate sex act for each count as is necessary to prevent merger or combination of the convictions into a single count." He contends the marshalling instructions given resulted in a circumstance akin to those in *Love*.

As acknowledged by Osborn, *Love* involved two assaultive crimes where willful injury was a lesser-included offense of the other offense charged—attempted murder. There, the supreme court held:

> Under the instructions in this case, the jury was only asked to proceed serially through a list of crimes and determine which crime was supported by the totality of the record. Under the unique circumstances of the instructions given in this case, and after comparing the marshaling instructions and statutory elements of willful injury and assault with intent, we conclude the offenses should merge.

*Love*, 858 N.W.2d at 725.

Here, the jury was instructed on four separate counts of sexual abuse in the third degree. The jury was also instructed:

> The Defendant has been charged with four counts in the Trial Information. This is just a method of bring each of the charges to trial. If you find the Defendant guilty or not guilty on any one of the four counts, you are not to conclude the Defendant is guilty or not

guilty on the other(s). You must determine whether the Defendant is guilty or not guilty separately on each count.

Thus, the circumstances here are not like the "unique circumstances of the instructions" given in *Love*. *Id.*

We conclude the district court did not impose an illegal sentence because the record supports a determination that Osborn committed four acts of sexual abuse in violation of Iowa Code section 709.4. *See State v. Ross*, 845 N.W.2d 692, 705–06 (Iowa 2014) ("Our merger doctrine is limited to double jeopardy claims involving lesser-included offenses. Ross's argument does not involve lesser-included offenses, but rather the same statute charged multiple times.").[2] We add, although the better practice is to provide some discernable distinction in each marshalling instruction for each count for the benefit of the jury and our review, we find no error where the State clearly identified the four separate acts in closing arguments and Osborn agrees there is substantial evidence to support the four counts.

We affirm the sentences imposed and preserve any ineffectiveness claims for possible postconviction relief proceedings.

**AFFIRMED.**

---

[2] Iowa Code 701.9, Iowa's merger statute, provides:

> No person shall be convicted of a public offense which is necessarily included in another public offense of which the person is convicted. If the jury returns a verdict of guilty of more than one offense and such verdict conflicts with this section, the court shall enter judgment of guilty of the greater of the offenses only.

The circumstances presented here do not constitute a conviction for "necessarily included" offenses as used in section 701.9.