# IN THE COURT OF APPEALS OF IOWA

No. 19-0152
Filed August 5, 2020

**STATE OF IOWA,**
       Plaintiff-Appellee,

**vs.**

**WALTER CORDELL WILLIAMS,**
       Defendant-Appellant.
_____

       Appeal from the Iowa District Court for Black Hawk County, Kellyann Lekar,

Judge.


       The defendant appeals from his convictions for involuntary manslaughter

while committing a public offense and child endangerment resulting in death.

**AFFIRMED.**


       Martha J. Lucey, State Appellate Defender, and Bradley M. Bender,

Assistant Appellate Defender, for appellant.

       Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney

General, for appellee.


       Considered by Mullins, P.J., Greer, J., and Potterfield, S.J.*

       *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2020).

**POTTERFIELD, Senior Judge.**

Walter Williams appeals from his convictions for involuntary manslaughter while committing a public offense and child endangerment resulting in death. Williams maintains there was insufficient evidence to support his conviction, makes ineffective-assistance claims regarding counsel's failure to object to some jury instructions and move for a new trial based on the weight of the evidence,[1] and complains the court improperly imposed restitution.

**I. Background Facts and Proceedings.**

Four-year-old J.H. was pronounced dead in the late hours of July 8, 2017. After an autopsy two days later, the medical examiner determined J.H. died from blunt force injuries to the chest and abdomen. Williams, who is the father of two of J.H.'s younger siblings and who was caring for J.H. from approximately 1:00 p.m. on July 8 until the time he died, was charged with first degree murder, pursuant to Iowa Code section 707.2(1)(e) (2017), and child endangerment resulting in the death of a child, pursuant to Iowa Code section 726.6(4).

Williams pled not guilty. Following an eight-day jury trial, he was convicted of involuntary manslaughter while committing a public offense—a lesser-included offense of first-degree murder—and child endangerment resulting in death of a

---

[1] Judgment was entered against Williams on January 18, 2019, so the amended Iowa Code section 814.7 (Supp. 2019) does not preclude him from raising these claims of ineffective assistance on direct appeal. *See State v. Damme*, 944 N.W.2d 98, 103 n.1 (Iowa 2020) (noting "the 2019 amendments to Iowa Code sections 814.6 and 814.7 do not apply retroactively to direct appeals from a judgment and sentence entered before the statute's effective date of July 1, 2019" and "reiterat[ing] that date of the *judgment* being appealed controls the applicability of the" amended code sections); *see also* Iowa Code § 814.7 (requiring defendants to raise claims of ineffective assistance of counsel in application for postconviction relief rather than on direct appeal).

child. The court determined the two offenses merged and sentenced Williams only under the child-endangerment conviction. Williams was sentenced to a term of incarceration not to exceed fifty years. He appeals.

## II. Discussion.

### A. Sufficiency of the Evidence.

Williams challenges the sufficiency of the evidence for both of his convictions. We review challenges to the sufficiency of the evidence for correction of errors at law. *State v. Romer*, 832 N.W.2d 169, 174 (Iowa 2013). We will uphold a defendant's convictions when they are supported by substantial evidence. *State v. Williams*, 674 N.W.2d 69, 71 (Iowa 2004). "Substantial evidence means evidence 'that could convince a rational trier of fact that a defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). In reviewing the evidence supporting a guilty verdict, we "consider all the record of evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Romer*, 832 N.W.2d at 174 (citation omitted).

The State bears the burden of proving every element of the crimes beyond a reasonable doubt. *Williams*, 674 N.W.2d at 71. As to both convictions, Williams maintains the State failed to prove "the requisite intent for each charge or alternative" and that it was Williams's actions that directly caused the death of J.H. We consider the evidence supporting each conviction in turn.

**Involuntary Manslaughter while Committing a Public Offense.** For the jury to properly convict Williams of involuntary manslaughter while committing a public offense, the State had to prove all of the following:

1. On or about the 8th and 9th days of July, 2017, Walter Williams, recklessly committed the crime of:
    (a) child endangerment as defined in instruction No. 30 or
    (b) assault as defined in instruction No 31.
2. When Walter Williams committed the crime, he unintentionally caused the death of [J.H.]

The jury was instructed that

[a] person commits child endangerment when they are a parent or person having custody or control over a child under the age of fourteen years and acted with knowledge that their acts were creating a substantial risk to the child's physical health or safety, or intentionally committed an act or a series of acts or used unreasonable force, torture or cruelty that resulted in physical injury to the child.

It was also instructed that assault

occurs when a person does an act which was intended to cause pain or injury or result in physical contact which was insulting or offensive; or place another in fear of an immediate physical contact which would have been painful, injurious, insulting or offensive to them and had the apparent ability to do the act.

"Apparent ability" means a reasonable person in Walter Williams' position would expect that act to be carried out under the existing facts and circumstances.

The evidence introduced at trial, when viewed in the light most favorable to the State, supports this conviction. J.H.'s mother, Danielle, testified that four-year-old J.H. was "his normal self," "[h]yper and happy" at the time she left for work—approximately 1:00 p.m. on July 8, 2017. Once Danielle left for work, Williams was left in charge of J.H., J.H.'s four siblings, and J.H.'s twelve-year-old aunt, A.C. According to A.C., J.H. was upstairs with Williams after Danielle left and A.C. heard "constant[]" "stomping noises" coming from upstairs. J.H.'s oldest sister, who was ten years old on July 8, described hearing "boom noises" while also hearing J.H. scream and cry. Later, both girls saw vomit and blood on a towel upstairs. At some point during the day, A.C. noticed J.H. appeared unable to walk and looked

"sad." Sometime after approximately 9:00 p.m., she saw J.H. without a shirt and noticed "bruises going across his chest." At this point, he was lying on Danielle's bed and it looked "like he couldn't—like he wasn't opening up his eyes."

Beginning at 11:24 p.m., Williams called his sister eight times and her fiancé three times. On the eleventh call, his sister—who was studying to be a nurse—answered. Williams immediately asked to speak to her fiancé and then asked him to come over quickly. Only after making those eleven calls, Williams called 911 at 11:33 p.m. He reported he found J.H. unresponsive in the bathtub; he gave the name of the sister's fiancé as his when asked. When medical personnel arrived a few minutes later, they noted J.H. was dressed in underwear and pants. They also noted J.H., his clothes, the bed on which J.H. lying, and the bathtub were all dry. J.H. was not breathing and did not have a pulse. He was transported to a local hospital by ambulance and pronounced dead before midnight.

Williams was interviewed by police in the early morning hours of July 9. During the interview, he was asked if he ever hits J.H., and he responded, "Yep." At another point, Williams told the officer he "hit him all the time."

The medical examiner conducted an autopsy on July 10. At trial, the medical examiner testified J.H. had a "number of bruises" "in areas which were not typical of where accidental bruises should be." J.H. also had "patterned bruises," which "usually implies that the person was struck by some type of object." According to the doctor, the fact that J.H. had "clustered bruises, multiple bruises in the same area, lots of bruises, and then the pattern bruises" gave him concern "that this was some type of abuse case." During the internal examination, the medical examiner found blood in the right and left chest cavities and the peritoneal

cavity; hemorrhaging and three tears in J.H.'s liver; and hemorrhaging in the pancreas, right lung, and adrenal gland. He opined J.H. suffered these injuries zero to forty-eight hours before his death. Based on these findings, the medical examiner determined that J.H. died from blunt force injuries to the chest and abdomen at the hands of another person—not due to an accidental injury.

From this evidence, the jury could conclude that J.H. was uninjured when his mother left for work. Sometime between then and 11:33 p.m., Williams repeatedly struck J.H.—causing the "constant[]" "boom" or "stomping" noises the girls heard and leading J.H. to scream and cry. Williams was a man in his twenties, while J.H. was four years old and weighed about forty pounds. J.H. was struck with enough force to leave bruises covering his body and to cause internal hemorrhaging of multiple organs. Therefore, sufficient evidence supports that Williams's repeated striking of J.H. in the chest and body was an intentional act or a series of acts or use of unreasonable force, torture, or cruelty that resulted in physical injury to J.H. (child endangerment) and an act which was intended to cause pain or injury (assault). J.H. ultimately died from those injuries later.

**Child Endangerment Resulting in the Death of a Child.** For the jury to find Williams guilty of child endangerment resulting in the death of a child, the State had to prove all of the following:

> 1. On or about the 8th and 9th days of July, 2017, Walter Williams was the parent or person having custody or control of [J.H.]
> 2. [J.H.] was under the age of fourteen years.
> 3. (a) Walter Williams acted with knowledge that his acts were creating a substantial risk to [J.H.'s] physical health or safety, or
> (b) Walter Williams intentionally committed an act or a series of acts or used unreasonable force, torture or cruelty that resulted in bodily injury to [J.H.]
> 4. Walter Williams' acts resulted in the death of [J.H.]

Here, the jury answered an additional interrogatory indicating that some members of the jury found Williams acted with knowledge that this acts were creating a substantial risk to J.H.'s physical health or safety and other jurors found that Williams intentionally committed an act or a series of acts or used unreasonable force, torture, or cruelty that resulted in bodily injury to J.H.

The first alternative, "acted with knowledge that his acts were creating a substantial risk to [J.H.'s] physical health or safety," requires a finding that Williams knowingly acted and knowingly created a substantial risk to J.H.'s physical health or safety. *See State v. Schlitter*, 881 N.W.2d 380, 390 (Iowa 2016). "[T]he definition of 'substantial risk' in the context of child endangerment is: The very real possibility of a danger to a child physical's health or safety." *State v. Anspach*, 627 N.W.2d 227, 233 (Iowa 2001). The jury could reasonably conclude Williams, who was much larger than J.H., repeatedly struck J.H. with enough force that it left bruises covering J.H.'s body and caused hemorrhaging of several internal organs. Thus, the jury could find Williams knowingly acted in a way that put J.H.'s physical health at a substantial risk. The jury was aided in this finding by the instruction that it could infer Williams intended the natural result of his actions.

The second alternative, that Williams "intentionally committed an act or a series of acts or used unreasonable force, torture or cruelty that resulted in bodily injury to [J.H.]" is the same element required to find Williams guilty under the child-endangerment alternative in involuntary manslaughter while committing a public offense. As we already concluded the jury could reasonably make such a finding

under the other conviction, we reach the same conclusion for the same reasons here.

Substantial evidence supports both of Williams's convictions.

**B. Ineffective Assistance.**

Williams raises four claims under the ineffective-assistance framework. He argues counsel was ineffective for failing to challenge three jury instructions and for failing to move for a new trial based on the weight of the evidence.

"In order to support a claim of ineffective assistance of counsel, a defendant must show (1) that counsel failed to perform an essential duty and (2) that prejudice resulted." *State v. Kuhse*, 937 N.W.2d 627, 628 (Iowa 2019). "To prove counsel failed to perform an essential duty, the defendant 'must show that counsel's performance was deficient,' meaning counsel 'made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (citation omitted). "The crux of the prejudice component rests on whether the defendant has shown 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citation omitted). To establish prejudice in the context of his ineffective-assistance-of-counsel claims, Williams must show a reasonable probability that the result of the trial would have been different. *See id.* "The likelihood of a different result must be substantial, not just conceivable. A defendant must show the probability of a different result is sufficient to undermine confidence in the outcome." *Id.* (citation omitted). We must "consider the totality of the evidence, identify what factual findings would have been affected, and determine if the error was pervasive or isolated and trivial." *Id.* (citation omitted).

Here, because Williams raises four claims of ineffective assistance, "we should look to the cumulative effect of counsel's errors to determine whether [he] satisfied the prejudice prong of the *Strickland* test." *State v. Clay*, 824 N.W.2d 488, 500 (Iowa 2012).

**Jury Instruction No. 29: Specific Intent.** Williams maintains counsel provided ineffective assistance in failing to object to the specific-intent instruction, which included this: "Specific intent does not have to exist for any particular length of time. *It is sufficient if it exists any time before the act*." (Emphasis added.) Williams maintains this is an incorrect statement of law and allowed the jury to convict him of child endangerment resulting in death if it found he had the specific intent to cause J.H. bodily injury at any time prior to J.H.'s injuries.

Our supreme court has previously ruled that "specific intent is linked to the proscribed act and therefore must be present at the time of the proscribed act." *State v. Hanes*, 790 N.W.2d 545, 556 (Iowa 2010). It is likely trial counsel breached an essential duty by failing to object to this improper instruction. *See id.* (deciding the court "need not address whether defense counsel's failure to object [to this instruction] was deficient and caused [the defendant] prejudice" because the court reversed on other grounds).

**Jury Instruction No. 18: Williams's Out-of-Court Statements.** Williams maintains counsel breached an essential duty in failing to object to the jury instruction regarding his out-of-court statements, which states, "Evidence has been offered to show that the defendant made statements at an earlier time and place. If you find any of the statements were made, then you may consider them

as part of the evidence, *just as if they had been made at this trial.*" (Emphasis added.)

At the time of Williams's trial in October 2018, this model jury instruction had been amended to delete the phrase "just as if they had been made at this trial', but not yet been ruled an incorrect statement of the law. *See, e.g.*, *State v. Chrzan*, No. 18-1327, 2019 WL 5067174, at *3 (Iowa Ct. App. Oct. 9, 2019) (collecting cases where the Iowa Court of Appeals rejected the contention the jury instruction misstated the law). Only recently, our supreme court ruled it is a misstatement of the law and erroneous. *See State v. Shorter*, 945 N.W.2d 1, 4-5 (Iowa 2020). We "do not expect counsel to anticipate changes in the law," and generally conclude "counsel will not be found ineffective for a lack of 'clairvoyance.'" *Millam v. State*, 745 N.W.2d 719, 722 (Iowa 2008). Though we note at least one panel of our court found counsel breached an essential duty in failing to object to this instruction when it was used in a trial after the model instruction was updated to strike the challenged language in June 2018. *See State v. Stroud*, No. 19-0457, 2020 WL 3571856, at *2 (Iowa Ct. App. July 1, 2020).

**Instruction No. 32: Caused or Directly Contributed.** Williams also challenges his counsel's failure to object to instruction no. 32, which states, "The injury inflicted by Walter Williams upon [J.H.] resulted in the death of [J.H.] if it caused or directly contributed to [J.H.]'s death." Williams argues this instruction is improper because it presumes Williams inflicted an injury on J.H. and does not refer to any other instruction or element to explain its purpose. He maintains the way this instruction was drafted "lessened the State's burden to prove an essential element of child endangerment resulting in death." The State responds that the

instructions, when read as a whole, properly instruct the jury and alleviate any concerns that the jury believed it was directed to find Williams injured J.H.

**Prejudice regarding Jury Instructions.** Despite Williams's contention otherwise, the prejudice necessary to find reversible error under the ineffective-assistance framework—*Strickland* prejudice—does not automatically result from a failure to object to an incorrect jury instruction. As our supreme court "recently emphasized," "presumed-prejudice standard applies to preserved errors in jury instruction" but "an ineffective-assistance-of-counsel claim based on failure to preserve jury instruction error must demonstrate deficiency and prejudice." *Kuhse*, 937 N.W.2d at 629; *see also Shorter*, 945 N.W.2d at 11 (noting that, although the out-of-court-statement instruction was erroneous, "[t]his does not mean that the instruction is necessarily prejudicial in a given case").

> We have made it clear that ineffective-assistance-of-counsel claims based on failure to preserve error are not to be reviewed on the basis of whether the claimed error would have required reversal if it had been preserved at trial. Rather, a defendant must demonstrate a breach of an essential duty and prejudice.

*State v. Maxwell*, 743 N.W.2d 185, 196 (Iowa 2008).

As the State recognizes, Williams has not attempted to establish how he was prejudiced by counsel's failure to object to these instructions. But this requires us to preserve Williams's claims for possible postconviction-relief proceedings rather than reject the claims. *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018) ("If the development of the ineffective-assistance claim in the appellate brief was insufficient to allow its consideration, the court of appeals should not consider the claim, but it should not outright reject it.").

**Weight of the Evidence.** Williams also argues trial counsel was ineffective for failing to move for a new trial based on the verdict being contrary to the weight of the evidence. Williams tacks this claim on to argument regarding sufficiency of the evidence. He lists the applicable legal standards, but he does not articulate how the weight of the evidence fails to support the verdict. *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998) (recognizing the "distinction between a sufficiency-of-the-evidence standard and a weight-of-the-evidence standard."). This argument is not sufficiently developed to enable our review of it. *See, e.g.*, *State v. Oliver*, No. 19-0208, 2020 WL 2487610, at *3 n.2 (Iowa Ct. App. May 13, 2020) (refusing to consider defendant's claim because defendant's appellate "brief does not contain an argument for us to address the weight-of-the-evidence issue based upon ineffective assistance of counsel"). Additionally, as Williams argues for cumulative prejudice and we preserve his other claims of ineffective assistance, we preserve this one as well. *See State v. Trane*, 934 N.W.2d 447, 466 (Iowa 2019) (preserving a claim of ineffective assistance because "it will facilitate consideration 'of the cumulative effect of the prejudice arising from all the claims'" (citation omitted)).

We preserve each of Williams's claims of ineffective assistance for possible postconviction-relief proceedings. *See Harris*, 919 N.W.2d at 754.

**C. Restitution.**

Williams argues the district court erred in ordering him to pay his court costs without first determining if he had the reasonability to pay. At the time it filed its appellate brief, the State conceded that case law required us to vacate that portion of the district court's sentencing order and remand for an ability-to-pay

determination.  *See State v. Albright*, 925 N.W.2d 159–160 (Iowa 2019) (ruling the court "can only assess" court courts "against the offender in an amount commensurate with the offender's reasonable ability to pay).

However, since then, new laws regarding restitution took effect.  Effective June 25, 2020, Senate File 457 (the Act) changes the process for determining offenders' reasonable ability to pay restitution in criminal cases.  *See* 2020 Iowa Acts, ch. 1074, § 59–83.  The Act provides the "[c]onversion of existing restitution orders," including any temporary or supplemental restitution order or "restitution order that does not contain a determination of the defendant's reasonable ability to pay," that were entered by a district court prior to the effective date "shall be converted to permanent restitution orders."  *Id.* at § 73 (to be codified as Iowa Code § 910.2B(1) (2021)).  The Act also provides, "The only means by which a defendant may challenge the conversion . . . is through the filing of a petition pursuant to section 910.7."  *Id.* at § 73 (to be codified as Iowa Code § 910.2B(2)).  The new provisions apply to the challenge of a conversion order both in the district court and on appeal.  *Id.* at § 73 (to be codified as Iowa Code § 910.2B(3)).  And, under another new subsection 910.7(4), "An appellate court shall not review or modify an offender's plan of restitution, restitution plan of payment, or any other issue related to an offender's restitution . . . unless the offender has exhausted the offender's remedies under this section and obtained a ruling from the district court . . . ."  In addition, "[a]ppellate review of a district court ruling under [section 910.7] shall be by writ of certiorari."  *Id.* at § 80 (to be codified as Iowa Code § 910.7(5)).

Because the Act removes our statutory authority to review or modify a plan of restitution before an offender exhausts the new district court remedies, we are

unable to consider the issue raised on appeal. *See id.* at § 73 (to be codified as Iowa Code § 910.2B(3)) ("The provisions of this chapter, including but not limited to the procedures in section 910.2A, shall apply to a challenge to the conversion of an existing restitution order in the district court and on appeal.").

Thus, we affirm the sentences and leave to Williams the opportunity, once jurisdiction returns to the district court, to challenge the conversion of the existing order under the new rules of sections 910.2A (describing new procedures for ordering and challenging the reasonable-ability-to-pay determination for category "B" restitution payments), 910.2B (describing procedures for converting and challenging existing restitution orders), 910.3 (determining the amount of restitution), and 910.7 (describing the only procedure for challenging the conversion of a restitution order). *See also* Iowa Supreme Ct. Supervisory Order, *In the Matter of Interim Procedures Governing Ability to Pay Determinations and Conversion of Restitution Orders* (July 7, 2020) (setting out additional relevant rules and deadlines).

**III. Conclusion.**

Substantial evidence supports Williams's convictions, so we affirm. Because Williams's claims of ineffective assistance are not sufficiently developed for our review, we preserve each of those claims for possible postconviction-relief proceedings. Due to the recently-enacted SF 457 and the resulting changes in the law regarding restitution, we affirm Williams's sentences and leave it to him, once jurisdiction returns to the district court, to challenge restitution under the new laws.

**AFFIRMED.**